**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CORINNE ELEANOR WUERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-1428 |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Corinne Wuerger ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").  This matter comes before the court on cross motions for summary judgment.  (Docket Nos. 9, 11).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

### II.    PROCEDURAL HISTORY

Plaintiff applied for DIB on October 28, 2009, claiming a disability onset of April 18, 2009.  (R. at 159 – 69).[1]  She claimed that her inability to work full-time allegedly stemmed from a mood disorder, carpal tunnel syndrome, arthritis in her legs and hands, alcohol abuse, leg injuries, and spurs on her spine.  (R. at 163).   Plaintiff was initially denied benefits on February 26, 2010.  (R. at 75 – 79).  Per the request of Plaintiff, an administrative hearing was held on

---

[1]        Citations to Docket Nos. 7 – 7-16, the Record, *hereinafter*, "R. at __."

May 3, 2011. (R. at 49 – 72). Plaintiff appeared to testify, represented by counsel, and a neutral vocational expert also testified. (R. at 49 – 72). In a decision dated May 13, 2011, the Administrative Law Judge ("ALJ") denied Plaintiff's application for benefits. (R. at 29 – 31). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on August 8, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed her Complaint in this court on July 12, 2012. (Docket No. 3). Defendant filed his Answer on January 8, 2013. (Docket No. 6). Cross motions for summary judgment followed. (Docket Nos. 9, 11). Plaintiff then filed a Reply Brief on February 27, 2013. (Docket No. 13). Accordingly, the matter has been fully briefed, and is ripe for disposition.

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on March 16, 1962, and was forty-seven years of age on the alleged disability onset date (R. at 159) and forty-nine[2] at the time of her administrative hearing. (R. at 126). She has two children. (R. at 65). Plaintiff is divorced, and lives with her adult son, who is mentally handicapped, in her home, where she is his caretaker. (R. at 61, 247, 253, 536). She also has a daughter who was incarcerated for a period for heroin-related offenses. (R. at 283). Plaintiff does not have much contact with this child, as she averred that her daughter stole from her. (R. at 66). The record indicates that this daughter moved in with Plaintiff when she was released from prison in November 2009, (R. at 285), but that Plaintiff had kicked her out in July 2010. (R. at 618). Plaintiff did not complete formal schooling, as she dropped out of high school, but ultimately earned her GED.[3] (R. at 52, 167). She had worked as a food service specialist,

---

[2] Plaintiff is defined as a "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.
[3] During Plaintiff's first psychiatric evaluation, she reported having her high school diploma. (R. at 247).

machine operator, nurse's aide, cashier, and meat department worker.[4] (R. at 185). Her longest tenured job was as a food service specialist in a therapeutic foster care home, which she held for ten years. (R. at 185). She last worked as a meat department worker at a major retail store. (R. at 185). Plaintiff was fired from this position on April 18, 2009 after she came to work intoxicated, and has not worked since. (R. at 53). Plaintiff has an extensive history of alcohol abuse, with both inpatient and outpatient treatment. She has also had eight DUIs over the past 25 years, resulting in house arrest for 13 months, 45 days in prison, and fines. (R. at 670). Plaintiff was sober for eleven years, from age 36 to 47, during which time she reported being employed consistently. (R. at 45, 170, 185, 665).

B. Mental Treatment History

The record indicates that Plaintiff was first brought to the emergency department of Allegheny Valley Hospital on April 18, 2009 when her employer, Wal-Mart, requested drug and alcohol testing, because her manager had a suspicion that Plaintiff had come to work intoxicated. (R. at 522, 524-25, 527). This corresponds with Plaintiff's alleged disability onset date. (R. at 159). At her diagnostic interview at Westmoreland Case Management and Supports ("Westmoreland") on June 2, 2009, she was diagnosed with bipolar disorder and assessed with a Global Assessment of Functioning score (hereinafter "GAF" score) of 35. (R. at 403). On June 23, 2009, she was seen at Family Services of Western Pennsylvania ("Family Services"), where she presented as sad, anxious, agitated and depressed. (R. at 532, 538). Plaintiff was diagnosed with bipolar disorder and alcohol abuse, and was assessed with a GAF score of 42. (R. at 541). A service plan and assessment were established by Westmoreland in September 2009 and again in October of 2010. (R at 408, 420).

---

[4]     The Dictionary of Occupational Titles lists "cook", "meat department worker" and "nursing assistant" as being  medium, semi-skilled substantial gainful activity ("SGA") skill levels, while a "cashier" is a light SGA skill level "on the lowest end" of semi-skilled. (R. at 67-68).

The record further shows that Plaintiff engaged in psychiatric treatment with Dr. Sharon Kohnen, MD, as well as therapeutic treatment with Sandra Crowley-Lindstrom, CSW, from July 2009 until February 2011 at Family Services. (R. at 245, 280, 644-45). She started treatment in a partial hospitalization program at Family Services in July 2009. (R. at 245). During Plaintiff's initial psychiatric evaluation on July 7, 2009, she reported two and a half years of low mood, decreased interest and enjoyment, poor sleep, poor appetite with a 60 pound weight loss over a two year period, low energy, poor concentration, guilt, irritability, and intermittent passive death wishes and suicidal ideation. (R. at 245). She also reported some reckless and impulsive behavior, such as spending too much money,[5] periods of promiscuity, aggression, and some hyperactive/aggressive symptoms and anxiety symptoms. (R. at 245). Plaintiff indicated that she had been fired from her job a few months prior because she showed up intoxicated. (R. at 245). She reported anxiety, obsessions with dirt and catastrophes, and compulsions including obsessively cleaning and checking locks. (R. at 246).

Dr. Kohnen reported that Plaintiff presented with a depressed, anxious, and restricted mood and affect, but also with organized thought processes, and fair insight and judgment. (R. at 247-48). She concluded that there was no evidence for psychosis, panic disorder, social phobia, eating disorder, or ADHD. (R. at 246). She further assessed Plaintiff's risk for aggressive behavior as moderate, and her risk for suicidal behavior as moderate but requiring more intensive treatment. (R. at 246). Dr. Kohnen diagnosed Plaintiff with mood disorder not otherwise specified and alcohol abuse, assessed her GAF score as 42, and prescribed Celexa[6], Klonopin[7],

---

[5]     The Evaluation notes indicate that Plaintiff was about $8,000 in debt at that time. (R. at 245).
[6]     "Celexa (citalopram) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Celexa is used to treat depression." Drugs.com, Celexa, available at: http:// www.drugs.com/celexa.html (last visited 5/13/13).
[7]     "Klonopin (clonazepam) is in a group of drugs called benzodiazepines […]. Clonazepam affects chemicals in the brain that may become unbalanced and cause anxiety. Klonopin is used to treat seizure disorders or panic disorder." Drugs.com, Klonopin, available at: http:// www.drugs.com/klonopin.html (last visited 5/13/13).

and Trazodone[8]. (R. at 249).

In a follow-up visit later in July 2009, Plaintiff presented as markedly anxious and sad, with a restricted affect, and reported that she was feeling worse, as her anxiety had increased. (R. at 252-53). She reported that she had not left the house as much, had spent "all her time" cleaning, and had contemplated going to the emergency department for a psychiatric admission. (R. at 252-53). Plaintiff further reported fleeting suicidal ideation without intent, but explained that she would not kill herself because of her dependent son. (R. at 252-53). She averred that she had not had alcohol since May 2009, and expressed that the Klonopin had helped, but that the Celexa had caused her daily headaches. (R. at 252-53). Dr. Kohnen discontinued Celexa, increased Klonopin, and initiated Paxil[9]. (R. at 253).

During her next appointment in August, Plaintiff reported feeling somewhat better with Paxil, but again presented as highly anxious with a restricted affect, and expressed a fleeting passive death wish with no intent. (R. at 255). She continued to present as such through each of her August 2009 appointments. (R. at 258, 261, 264, 267). However, by the end of the month, she reported feeling somewhat better overall, denied drug and alcohol use, talked more positively, and reported no fleeting suicidal ideation or plans. (R. at 265, 268). As a result, Plaintiff was released from the partial hospitalization program and began outpatient treatment with Dr. Kohnen in September 2009. (R. at 269). She was prescribed Seroquel[10]. (R. at 562).

---

[8]         "Trazodone is an antidepressant medication. It is thought to increase the activity of one of the brain chemicals (serotonin) which may become unbalanced and cause depression. Trazodone is used to treat depression. It may also be used for relief of anxiety disorders (e.g., sleeplessness, tension) and chronic pain." Drugs.com, Trazodone, available at: http:// www.drugs.com/trazodone.html (last visited 5/13/13).
[9]         "Paxil (paroxetine) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Paroxetine affects chemicals in the brain that may become unbalanced. Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder (PMDD)." Drugs.com, Paxil, available at: http:// www.drugs.com/paxil.html (last visited 5/13/13).
[10]        "Seroquel (quetiapine) is an antipsychotic medicine. It works by changing the actions of chemicals in the brain. Seroquel is used to treat schizophrenia in adults and children who are at least 13 years old. It is also used to

Plaintiff again reported sobriety in early October 2009, but expressed frustration with caring for her son. (R. at 563). Ms. Crowley-Lindstrom noted that Plaintiff's mood appeared to be more stable. (R. at 563). Later that month, Plaintiff appeared anxious and restricted, but indicated that she cared more about her appearance and slept better since starting Seroquel. (R. at 564-65). On October 26, Plaintiff again asserted her sobriety, but stated that all of her associates were still drinkers. (R. at 568).

Dr. Kohnen and Ms. Crowley-Lindstrom noted that Plaintiff presented as anxious and depressed, but with improvement in her appearance, in November 2009. (R. at 571). Plaintiff again denied drug and alcohol use and suicidal ideation, but expressed continuing stressors relating to her children, especially with regard to her daughter returning home to live after years in jail for heroin-related offenses. (R. at 569-70, 572, 574). Dr. Kohnen noted Plaintiff's diagnosis as bipolar disorder not otherwise specified, and assessed her with a GAF of 50. (R. at 573). In early January 2010, Plaintiff admitted to drinking two beers, but then contacted a sober friend, presumably for reinforcement. (R. at 581). Later that month, Plaintiff reported that she felt like drinking due to stressors with her daughter; however, she again called sober friends and avoided drinking. (R. at 587).

In early February 2010, Dr. Kohnen noted that Plaintiff had moderate limitations in her ability to carry out detailed instructions, make judgments in work-related decisions, interact appropriately with the public, respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (R. at 306). Furthermore, Dr. Kohnen noted that to her knowledge, Plaintiff did not have any continuing difficulties with alcohol abuse at that time. (R. at 307). Later that month, Plaintiff again denied drug and alcohol usage. (R. at 592). Medications

---

treat bipolar disorder (manic depression) in adults and children who are at least 10 years old. Seroquel is also used together with antidepressant medications to treat major depressive disorder in adults." Drugs.com, Seroquel, available at: http:// www.drugs.com/seroquel.html (last visited 5/13/13).

were continued without change. (R. at 592). In March of that year, Ms. Crowley-Lindstrom opined that Plaintiff was more stable than when she began treatment in June 2009, but that she still experienced aggravation when dealing with stressors. (R. at 596). When Plaintiff returned to Dr. Kohnen in April 2010, her mental status examination was unremarkable other than presenting as moderately depressed and anxious. (R. at 597). Dr. Kohnen noted mild to moderate improvement with medication, as Plaintiff said that she was doing "ok," denied drug and alcohol use, and was on steady dosages of medication. (R. at 598).

In June 2010, Plaintiff admitted that she had begun drinking again, and that she had climbed onto her roof and wanted to jump while she was under the influence of alcohol. (R. at 603). Ms. Crowley-Lindstrom referred her to a partial hospitalization program and Alcoholics Anonymous because of this relapse. (R. at 603). After attending several sessions of the partial hospitalization program, Plaintiff was admitted to Allegheny Valley Hospital on July 15th, 2010. (R. at 458). Family Services concurrently filed a 302 petition for inpatient psychiatric evaluation, because Plaintiff had been showing up intoxicated and made passive death threats while at her therapy sessions. (R. at 458). She presented on admission with a blood alcohol level of 0.347, and admitted to drinking about 13 to 15 cans of beer per day on a very regular basis. (R. at 440). Plaintiff mentioned that she had been going to Alcoholics Anonymous, but had been "in a downward spiral." (R. at 440). During her inpatient stay, Plaintiff was found to have a GAF of 30. (R. at 441). Dr. Kiran Deoras, M.D., opined that Plaintiff's prognosis was dependent upon her sobriety. (R. at 441). Over the next few days, Plaintiff was noted as doing better, and was released on July 20, 2010. (R. at 465, 467-70, 473-74). On discharge, Dr. Deoras diagnosed Plaintiff with bipolar disorder, alcohol dependence, and chronic back and hip pain, with a variety of stressors and GAF of 40. (R. at 439). She refused alcohol rehabilitation, stating that she had to

care for her son. (R. at 439). Accordingly, psychiatric follow-up and substance abuse treatment was ordered through SPHS Behavioral Health/Southwest Behavioral Care ("SPHS") for July 26, 2010. (R. at 439).

Unfortunately, Plaintiff was brought back into the emergency room at Allegheny Valley Hospital by police on July 24, 2010 after being found in her car with an empty bottle of wine and multiple empty beer cans. (R. at 428). Dr. Mark Scheatzle, M.D., diagnosed Plaintiff with acute alcohol intoxication and eventually released her into police custody. (R. at 429). She was charged with driving under the influence for the incident. (R. at 434). Plaintiff began rehabilitation treatment at SPHS on July 26, 2010, immediately following the hospitalization, and was seen regularly at this location until March 24, 2011. (*See* R. at 647-75). Yet, on August 24, 2010, Plaintiff reported to a therapist at SPHS that she drank eight beers on August 23rd after a fight with her brother. (R. at 658). That same day, Plaintiff told Dr. Jeffrey Lineman, D.O.,[11] her treating physician, that she drank two martinis on August 23 and nine beers on August 22. (R. at 344-45).

Plaintiff returned to Dr. Kohnen in January 2011 after a six-month lapse in treatment with her. (R. at 637).[12] Dr. Kohnen noted that Plaintiff appeared to be moderately intoxicated,[13] as she smelled of alcohol, was disheveled, and was slurring her speech. (R. at 639). Plaintiff denied any depression symptoms. (R. at 639). She reported that she had not seen a psychiatrist at her drug treatment program at SPHS, but was still seeing a counselor, and that although she had

[11]     "A doctor of osteopathic medicine (D.O.) is a physician licensed to practice medicine, perform surgery, and prescribe medication."  U.S. National Library of Medicine National Institutes of Health , Doctor of Osteopathic medicine, available at: http://www.nlm.nih.gov/medlineplus/ency/article/002020.htm  (last visited 5/13/13).

[12]     As noted in the previous paragraph, the Record indicates that Plaintiff was seen regularly at SPHS from July 26, 2010, until March 24, 2011, which spans the six-month absence noted by Dr. Kohnen. (R. at 647-76).

[12]     Plaintiff also reported DUIs in March 2002 and May 2002. (R. at 57). Furthermore, during her intake at SPHS on July 26, 2010, Plaintiff reported eight DUIs over the past 25 years, which, as noted above, resulted in house arrest for 13 months, 45 days in prison, and fines. (R. at 670).

[13]     The Court notes that in her January appointment at SPHS, Plaintiff denied alcohol use. (R. at 649).

stopped taking Seroquel, she needed refills on Paxil and Klonopin. (R. at 637). Due to the addictive nature of Klonopin, Dr. Kohnen informed Plaintiff she would no longer prescribe the drug to her. (R. at 640). Dr. Kohnen's diagnostic impression of Plaintiff was noted as alcohol dependence and mood disorder not otherwise specified, ruling out mood disorder due to alcohol and ruling out bipolar disorder, not otherwise specified. (R. at 640). Plaintiff's GAF was assessed to be 45. (R. at 640).

When Plaintiff presented for a follow-up appointment with Dr. Kohnen in February 2011, the doctor noted that Plaintiff did not appear intoxicated, and that Plaintiff indicated that she was doing "ok," but was sometimes very anxious. (R. at 642). Dr. Kohnen found that other than appearing moderately anxious with a restricted affect, Plaintiff's examination was essentially unremarkable, as she did not appear to be intoxicated, denied suicidal or homicidal ideation, and reported continued contact with her Alcoholics Anonymous sponsor and therapist. (R. at 642-43). After Plaintiff's insurance plan denied a prescription for Lexapro[14], she was prescribed Effexor[15]. (R. at 644-45). In her February appointment at SPHS, Plaintiff reported continuing stress, but relief at "getting her meds straightened out." (R. at 648). Over the course of her treatment at SPHS, Plaintiff did not report any suicidal or homicidal ideation, and the therapists noted positive changes with areas of recovery. (*See* R. at 647-75). By the end of her treatment in March 2011, Plaintiff had consistently maintained sobriety. (R. at 647-57).

C. Physical Treatment History

Plaintiff avers that her carpal tunnel syndrome is a severe impairment that prevents her

---

[14]     "Lexapro (escitalopram) is an antidepressant belonging to a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Escitalopram affects chemicals in the brain that may become unbalanced and cause depression or anxiety." Drugs.com, Lexapro, available at: http:// www.drugs.com/lexapro.html (last visited 5/13/13).
[15]     "Effexor (venlafaxine) is an antidepressant in a group of drugs called selective serotonin and norepinephrine reuptake inhibitors (SSNRIs). Venlafaxine affects chemicals in the brain that may become unbalanced and cause depression." Drugs.com, Effexor, available at: http:// www.drugs.com/effexor.html (last visited 5/13/13).

from working. (Docket No. 10 at 3). Despite same, there is no supporting diagnostic testing nor reported diagnosis of same, other than a mention of a positive Tinel's sign[16] in the report of consultative physician, Dr. Hadi Firoz, M.D. (R. at 322). In fact, Dr. Firoz noted that despite Plaintiff stating she would follow up with a surgeon regarding her carpal tunnel syndrome[17], that Plaintiff's strength was normal; there was no thenar[18] or hypothenar[19] muscle wasting[20]; and her condition "did not seem to be that advanced at least based on the physical exam." (R. at 322).

Although Plaintiff did not claim back pain as a severe impairment on her self-report, she claimed that it was a medical condition that limited her ability to work during her administrative hearing, and explained that she sees a chiropractor for this condition. (R. at 54). The record indicates that Plaintiff sporadically complained of pain in her back, which she had experienced for years, but which was relieved with rest, ibuprofen, and/or chiropractic care. (R. at 320, 322, 349, 441, 495). Furthermore, Dr. Firoz, the consultative physician, indicated that Plaintiff could sit comfortably; get onto and off of the examination table without any help; had full range of motion in her extremities; exhibited no tenderness along the spine; exhibited some tenderness along the sacroiliac joints on both sides; had 5/5 motor strength in the upper and lower extremities; and displayed normal gait. (R. at 321-22). Dr. Lineman had similar findings in July and August 2010. (R. at 345, 351). Specifically, in August of 2010, Dr. Lineman found that Plaintiff's lumbosacral spine area revealed no local tenderness or mass, and that she had full and painless lumbosacral range of motion. (R. at 345). Plaintiff's straight leg raise was negative at 90

---

[16]     "Tinel's sign: a sensation of tingling, or of "pins and needles," felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve." STEDMAN'S MEDICAL DICTIONARY, 1772 (28th ed. 2006).

[17]     Nothing in the record indicates that Plaintiff was evaluated by a surgeon.

[18]     "Thenar: term applied to any structure in relation with the base of the thumb or its underlying collective components." STEDMAN'S MEDICAL DICTIONARY, 1970 (28th ed. 2006).

[19]     "Hypothenar: denoting any structure in relation with the hypothenar eminence or its underlying collective components." STEDMAN'S MEDICAL DICTIONARY, 697-38 (28th ed. 2006).

[20]      "Muscle wasting: denoting a disease characterized by emaciation." STEDMAN'S MEDICAL DICTIONARY, 2146 (28th ed. 2006).

degrees on both sides, and her deep tendon reflexes, motor strength and sensations were all normal, including heel and toe gait. (R. at 345). Plaintiff's peripheral pulses were palpable, and her hips and knees had full range of motion without pain. (R. at 345). Dr. Lineman also noted that Plaintiff's lumbar pain improved with ibuprofen. (R. at 346). In January 2011, Plaintiff was also diagnosed with a lobular carcinoma[21] in her left breast, and was noted to be at high risk for breast cancer. (R. at 644). She was prescribed tamoxifen.[22] (R. at 644).

### D. Functional Capacity

A Mental Residual Functional Capacity Assessment was performed by John Rohar, Ph.D. on January 6, 2010. (*See* R. at 287-302). Dr. Rohar determined, based on the medical evidence of record, that Plaintiff suffered from medically determinable impairments of bipolar disorder not otherwise specified, mood disorder not otherwise specified, and alcohol abuse. (R. at 289). He further opined that Plaintiff would be able to perform simple, routine, repetitive work in a stable environment, could understand, retain and follow simple job instructions (i.e. perform one and two step tasks) and make simple decisions. (R. at 289). Additionally, Dr. Rohar opined that Plaintiff would be capable of asking simple questions and accepting instructions, and that she could function in production oriented jobs requiring little independent decision making. (R. at 289). Dr. Rohar also found that despite the limitations resulting from her impairments, Plaintiff would be able to meet the basic mental demands of competitive work on a sustained basis. (R. at 289). Thus, Plaintiff's statements concerning the severity of her symptoms were assessed to be "partially credible." (R. at 289).

A Physical Residual Functional Capacity Assessment was performed by Dr. Paul Fox,

---

[21]     "Lobular carcinoma: a form of adenocarcinoma, especially of the breast, where lobular carcinoma is less common than ductal carcinoma and usually is composed of small cells." STEDMAN'S MEDICAL DICTIONARY, 310 (28th ed. 2006).

[22]     "Tamoxifen: a synthetic nonsteroidal estrogen antagonist used in the prevention and treatment of breast cancer." STEDMAN'S MEDICAL DICTIONARY, 1934 (28th ed. 2006).

M.D., on February 24, 2010. (*See* R. at 324-30). Dr. Fox noted Dr. Firoz's consultative evaluation on February 15, 2010, where Plaintiff:

- was observed to sit comfortably;
- was able to get on and off the examination table without assistance;
- was able to walk without an assistive device;
- although there was some sacroiliac joint tenderness bilaterally, Plaintiff's straight leg raising was negative;
- her vital signs, gait, strength, sensation, head, ears, nose, and throat, neck, lungs, heart, abdomen, extremities, and back were normal;
- the Tinel's sign was positive bilaterally, but that Plaintiff was able to oppose the thumbs and had normal grip strength.

(R. at 312-23, 329).

Accordingly, Dr. Firoz found that Plaintiff was limited in standing, walking, lifting, and carrying, but believed that she would be able to frequently lift 25 pounds, occasionally lift 50 pounds; frequently carry 20 pounds, and stand for three hours. (R. at 312).

Dr. Fox opined that Dr. Firoz's observations regarding Plaintiff's limitations for standing and walking were not consistent with the evidence in the claim file folder, but that the findings regarding her lifting and carrying were "fairly consistent" with the other evidence, and were thus given greater weight. (R. at 330). Relying partially on Dr. Firoz's report, Dr. Fox concluded that Plaintiff's claims of limitations were outweighed by other evidence, as she was able to participate in daily activities such as caring for her personal needs, performing routine household activities, caring for her medically handicapped son, driving a car and relating fairly well to others. (R. at 329). Dr. Fox also noted that the treatment for Plaintiff's carpal tunnel syndrome was essentially routine and conservative, and that she had not received treatment from a specialist. (R. at 330). Ultimately, it was Dr. Fox's opinion that Plaintiff's statements concerning the severity of her ailments were "partially credible." (R. at 329).

E.  Administrative Hearing

At the administrative hearing, Plaintiff testified that she had not worked for pay or otherwise since April 2009, when she was fired for coming to work intoxicated. (R. at 53). She indicated that she had insurance, was currently seeing Dr. Kohnen at Family Services and had been for some time. (R. at 54). She explained that during the six month lapse in treatment noted by Dr. Kohnen, she was in another program at SPHS. (R. at 54-55).[23] Plaintiff stated that she was sober, and had been since January 2011. (R. at 55-56). Prior to that date, she stated that she was drinking "a real lot," but that she was getting better. (R. at 56). She reported that from age 36-47, she was sober, but started drinking again because she ran out of medication. (R. at 56). Plaintiff further reported that as a result of her July 2010 DUI, she would be on house arrest for one year. (R. at 56).

Plaintiff has difficulty getting along with others, difficulty with authority figures, and does not handle stress or changes in routine well. (R. at 203). Her daily activities include getting up, taking her medications and giving her son his medications, then making breakfast and cleaning. (R. at 197). She makes meals daily, depending on her mood – usually preparing whatever is most convenient. (R. at 199). She attends Psychiatric Rehabilitation Services, her coping skills group, at Family Services, as well as any other scheduled appointments. (R. at 197). Plaintiff claims that she has others - usually friends or her brother - transport her to appointments, as she does not like to leave the house alone due to her anxiety. (R. at 197-98, 200). She then returns home "to attempt to care for [her] basic needs (i.e. hygiene)," try to finish chores, take her medications and attempt to sleep by 8 p.m. (R. at 197). She hears noises at night, which increases her anxiety. (R. at 198).  She has some difficulties with personal care, and there are some days when she does not want to complete any personal care tasks, but is reminded to by

---

[23]  As noted above, the Record supports this testimony. (R. at 647-76).

her brother and friends. (R. at 198-99). She needs reminders to take her medications and to complete house and yard work. (R. at 199). Finally, although she avers that she has lost interest in hobbies, Plaintiff spends time with others once a month to talk about feelings or participates in activities including playing cards. (R. at 201).

In terms of her physical health, Plaintiff asserted that she had been diagnosed with carpal tunnel syndrome in her hands and wrists, and wore splints at night for this condition. (R. at 58-59). She reported that she experienced instances where her hands "froze up" and she dropped things. (R. at 60). She explained that she could use her hands consistently for about 5 to 10 minutes before they froze up, and then had to wait 5 to 10 minutes before she could use them again. (R. at 60). Yet, she did not want surgery for these complaints. (R. at 61). In fact, she reported a doctor had not treated her for her carpal tunnel syndrome for a "couple years." (R. at 60). Plaintiff claimed that she also saw a chiropractor for back pain. (R. at 57-58).

Plaintiff testified that her day was spent lying in bed until a counselor came to get her out. (R. at 62). But, she also said she was "getting better" at getting out of bed on her own. (R. at 62). She would "do things around the house," proceeding from room to room, pausing to sit down, and then starting again. (R. at 64). She watched a lot of movies with her son. (R. at 65). Other than her son, one friend who Plaintiff saw "once in a while," and a woman from Family Services who visited Plaintiff, she did not appear to have any social contacts. (R. at 65). Plaintiff advised that she had not had alcohol since January of 2011, but that when she was drinking, she drank approximately 9 to 15 beers a day. (R. at 62-63). She had noticed a difference in her conditions since she stopped drinking, specifically not getting nauseous and being able to think better. (R. at 64). Plaintiff also reported she still had anxiety and depression, but was on medication for these ailments. (R. at 64).

At the conclusion of Plaintiff's testimony, the ALJ asked the vocational expert[24] whether the type of work Plaintiff had done in the past would be eliminated for a person who was limited to simple, routine repetitive tasks not performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few workplace changes. (R. at 70). In addition, the ALJ noted that the individual would also be limited to occupations not involving hours of stress, i.e., those requiring independent decision-making or occupations subject to close supervision or close interaction with co-workers or the general public, and with no operation of hand controls. (R. at 70). The vocational expert replied in the affirmative. (R. at 70). The ALJ then asked the vocational expert if jobs existed in the national economy for a hypothetical individual of Plaintiff's age, educational background, and work experience, with Plaintiff's limitations. (R. at 70). The vocational expert replied that such an individual could work as a hand packer (medium, unskilled), with about 60,000 jobs nationwide; or a laundry worker in any industry (medium, unskilled), with about 75,000 jobs nationwide; or a cleaner or industrial cleaner (medium, unskilled), with over two million jobs nationwide. (R. at 70-71). Finally, the ALJ asked if any of these jobs would be eliminated if the individual would be unable to perform his job, because of symptoms from his impairments, for ten percent of the work day on a consistent basis. (R. at 71). The vocational expert replied that this limitation would eliminate the proffered employment, as well as all jobs. (R. at 71).

## IV.   STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death,

---

[24]       The vocational expert who appeared and testified at Plaintiff's hearing was Frances N. Kinley, M.Ed., C.R.C. (Certified Rehabilitation Counselor) and L.P.C. (Licensed Professional Counselor). No objections were made to the expert's credentials nor to the testimony itself.

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[25], 1383(c)(3)[26]; *Schaudeck v.*

---

[25]    Section 405(g) provides in pertinent part:

   Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal places of business.

42 U.S.C. § 405(g).

[26]    Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Furthermore, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d Cir. 1986).

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

## V.  DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered from medically determinable severe impairments in the way of carpal tunnel syndrome, bipolar disorder[27], and substance abuse – specifically, alcohol abuse. (R. at 35). However, the ALJ determined that there was no real evidence to suggest that any medically determinable back impairment had more than a minimal effect on Plaintiff's ability to work, that any such impairment was non-severe, and adequately accommodated by the limitation to medium work. (R. at 35). Furthermore, the ALJ reasoned that Plaintiff did not have persistent disorganization of motor function as to her carpal tunnel syndrome, as there was no record pertaining to it, other than a mention of a positive Tinel's sign in the report of the consultative physician. (R. at 35).

The ALJ explained that Plaintiff was "under a disability" as a result of limitations stemming from all of the above impairments, but that a substance use disorder – alcohol abuse – was a contributing factor material to the determination of disability. (R. at 32).  Thus, the ALJ held that Plaintiff had not been disabled under the Social Security Act at any time from the alleged onset date through the date of the decision. (R. at 32-33). Based upon the testimony of the vocational expert, the ALJ concluded that after considering all of Plaintiff's impairments, including her alcohol abuse, that she would be unable to perform any past relevant work, and that there were no jobs in existence in the national economy that she could perform. (R. at 42-43).

The ALJ determined that if Plaintiff abstained from alcohol, her remaining limitations would cause more than a minimal impact on her ability to perform basic work activities, and that therefore, she would continue to have a severe impairment or combination of impairments. (R. at 43). On the other hand, if Plaintiff stopped the alcohol abuse, the ALJ found that she would have

---

[27]    This diagnosis was later altered to depressive disorder and generalized anxiety disorder. (R. at 35)(citing Ex. 17F at 531-645).

the residual functional capacity to perform medium work, except that she could not operate hand controls. (R. at 45). She would be limited to simple, routine, repetitive tasks not performed in a fast-paced production environment. (R. at 45). She could make simple, work-related decisions, and in general, would require relatively few workplace changes. (R. at 45). She would also be limited to occupations not involving high levels of stress, i.e., requiring independent decision-making or occupations subject to close supervision, or close interaction with co-workers or the general public. (R. at 45). The ALJ found that although Plaintiff would continue to be unable to perform past relevant work, she would be able to perform a significant number of jobs in the national economy. (R. at 47). Relying on these findings, as well as the testimony of the vocational expert, the ALJ denied Plaintiff DIB benefits because drug and alcohol abuse ("DAA"), in her case, alcohol, was material to the finding of disability. (R. at 48).

On appeal, Plaintiff primarily challenges the ALJ's DAA ruling with regard to her mental limitations. (Docket No. 10 at 6; *see also* R. at 48). In evaluating this decision, this Court must determine whether the ALJ's finding that Plaintiff's alcohol abuse was material to her mental disability is supported by substantial evidence. *Debaise v. Astrue*, Civ. A. No. 09-0591, 2010 WL 597488 (W.D. Pa. Feb. 16, 2010) (citing 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F. 3d 43, 46 (3d Cir.1994); *Monsour*, 806 F.2d at 1190).

Plaintiff objects to the ALJ's determination, arguing that agency policy regarding the analysis of the "materiality" of alcohol abuse is unambiguous, such that if a claimant's "severe non-DAA impairments are disabling without consideration of DAA, an award of benefits is required." (Docket No.10 at 5). To this end, Plaintiff argues that if a claimant establishes that his or her impairments continue to be disabling during a documented sobriety period, or if the evidence is unclear, the appropriate decision is to award benefits. (*Id.* at 5). Plaintiff claims that

she continued to experience disabling mental limitations during such prolonged period of sobriety, which she argues was approximately from April 2009 to April or July 2010, "depending on how the 'brief relapse' from April 2010 is construed." (*Id.* at 6). Since Plaintiff contends that she continued to suffer from disabling mental impairments as a result of her diagnosed depression and anxiety, she claims that at most, the record is unclear, which requires that she be awarded DIB, or in the alternative, the case be remanded to require the ALJ to articulate his decision consistent with Agency policy. (*Id.* at 11).

Defendant counters that the ALJ properly applied the regulation concerning DAA to determine that Plaintiff's alcohol abuse was a contributing factor material to the determination of disability. (Docket No. 12 at 9). Defendant maintains that there is substantial evidence to support the ALJ's determination that Plaintiff's non-DAA impairments were not disabling during her period of sobriety. (*Id.* at 11). Defendant also argues that the evidence of record does not indicate that Plaintiff was sober from April 2009 to April or July 2010, but that the record reflects that she continued to abuse alcohol. (*Id.*) (citing R. at 247, 525-27). For the following reasons, the Court finds Defendant's arguments to be more persuasive.

As with all Social Security cases, and as noted above, a claimant must prove to the Commissioner that he or she is incapable of engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *Brewster*, 786 F.2d at 583. When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met this requirement. 20 C.F.R. §§ 404.1520, 416.920. Assuming that a claimant meets his or her burden at Steps 1 through 4, Step 5 places a burden upon the Commissioner to prove that a particular claimant is able to perform substantial gainful activity in jobs available in the national economy. *Doak*, 790 F. 2d at 28.

In cases involving DAA, however, the Step 5 analysis takes on an additional component. The Act states that "an individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 428 (W.D. Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if he or she ceased to use drugs and/or alcohol. *See also Nomes v. Astrue*, 155 Soc. Sec. Rep. Serv. 860, 2010 WL 3155507 at *7–8 (W.D. Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D. Pa. 2005)).

Side effects of drug and alcohol abuse, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed. Soc. Sec. Ruling, SSR 13-2p.; Titles II & XVI: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), 2013 WL 621536, Docket No. SSA-2012-0006 (S.S.A Feb. 20, 2013).[28] It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work. *Id.* If it is not possible to distinguish between the limitations created by DAA and the claimant's other impairments, the ALJ must find that DAA is not a contributing factor material to disability. *Id.* This "materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." *Ambrosini*, 727 F. Supp. 2d at 430 (citing *Sklenar v. Barnhart*, 195 F. Supp. 2d 696, 699–706 (W.D. Pa. 2002)).

While an ALJ has the duty to develop a full and fair record, and provide substantial

---

[28] The Court recognizes that the ALJ could not have relied on this Social Security Ruling in making its determination on May 13, 2011, as the Ruling became effective on March 22, 2013. Soc. Sec. Ruling, SSR 13-2p. However, this Ruling expressly makes obsolete Emergency Message 96200, cited by Plaintiff (Docket No. 10 at 5) and in this Court's estimation, is consistent with *Robinson. See Robinson v. Comm'r of Soc. Sec.*, Civ. A. No. 11-765, 2012 WL 227736 (W.D. Pa. Jan. 24, 2012).

evidence to justify his final decision, it is important to emphasize that a claimant bears the ultimate burden of submitting evidence to prove disability. *Ventura*, 55 F.3d at 902; *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001) (citing *Hess v. Sec'y of Health, Ed. and Welfare*, 497 F.2d 837, 840 (3d Cir. 1974)). Moreover, as Plaintiff's counsel is undoubtedly aware, the present formulation of the burden of demonstrating materiality is "substantial evidence." *Burns*, 312 F.3d at 118. As this Court noted in *Robinson v. Comm'r of Soc. Sec.*, where Plaintiff's counsel was likewise attorney of record:

> [I]t is clear that at Step 5 of the analysis, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy for a claimant, despite established functional limitations. In non-DAA cases, this burden is met by providing substantial evidence from the case record to support the conclusion that a claimant can work. In cases where a claimant's use of drugs or alcohol may be the primary contributor of functional limitation, regulation provides that the ALJ's burden is to provide substantial evidence from the record to show that—absent DAA-related functional limitations—a claimant is eligible for a significant number of jobs in the national economy.

Civ. A. No. 11-765, 2012 WL 227736 at *11 (W.D. Pa. Jan. 24, 2012).

In this Court's opinion, the ALJ followed the appropriate procedure, considering all of the relevant evidence and adequately supported his determination that DAA was material to Plaintiff's disability with substantial evidence. To this end, the ALJ specifically relied upon the findings of Dr. Kohnen in determining what limitations were related to Plaintiff's alcohol abuse. (*See* R. at 39-42, 45-47). Significantly, Dr. Kohnen's records deal with the ill-effects of Plaintiff's alcohol abuse. As noted by the ALJ, her treatment notes suggest that Plaintiff required significant mental health treatment during periods when she was heavily abusing alcohol. (*See, e.g.,* R. at 36, 245, 345, 428, 440, 458, 534, 603). The record also shows that alcohol affected her ability to maintain normal daily routines, and supports a finding that Plaintiff had only moderate restrictions of daily activities. (R. at 36).

Plaintiff admitted that she lost her past employment due to her drinking (R. at 53), and

the record indicates that Plaintiff routinely drank excessively. (R. at 344-45, 428, 429, 434, 440, 458, 522, 524-25, 527, 603, 639, 658). She attempted detoxification and psychiatric treatment, but was often non-compliant with follow-up treatment, as documented in the record. (*See* R. at 344-45, 428, 438-40, 458, 603, 639, 658). During periods wherein Plaintiff abstained from alcohol, maintained her prescription medication regimen, and attended therapy, she showed significant improvement in her mental state, as the ALJ noted. (*See* R. at 56, 62, 64, 265, 268, 271, 563, 568, 571, 589, 596, 647-57, 642-43). In fact, even during the periods when she was heavily abusing alcohol, Plaintiff was able to maintain functionality, living and caring for her adult handicapped son. (*See* R. at 247, 330, 438-39, 536). By the end of her treatment, as documented in the record, Plaintiff continued to assert her sobriety, and reported experiencing only moderate limitations in functionality. (R at 647-57).

Based on her self-reports to Dr. Kohnen and the therapists at SPHS, Plaintiff had three periods of sobriety: from May 2009 until April 2010, aside from having two beers in January, 2010 (*See* R. at 252-53, 265, 568, 572, 581, 592, 598); from September until December 2010[29] (*See* R. at 650-57); and from February until March 2011, where the record ends. (*See* R. at 647-48). The record also indicates that Plaintiff abused alcohol in April 2009 (R. at 522, 527); from June 2010 to August 2010 (R. at 344-45, 428-29, 434, 440, 458, 603, 658); and in January 2011. (R. at 639).

In this Court's view, the records of Plaintiff's treatment do not disclose any instances in which Plaintiff's inpatient treatment and partial hospitalizations were precipitated solely from an increase in depression or anxiety. Rather, the record shows her hospital admissions followed renewed alcohol abuse. (R. at 428, 458, 522, 603); *see also Davis v. Astrue*, 830 F. Supp. 2d 31,

---

[29]     The Court notes that from September to December, 2010, SPHS therapists noted "positive changes" in Plaintiff, such as in her attitude, behavior, and involvement in Alcoholics Anonymous meetings. (*See* R. at 650-57). However, the therapists did not specifically report on Plaintiff's alcohol use.

46-47 (W.D. Pa. 2011) (comparing *Salazar v. Barnhart,* 468 F.3d 615, 620 and 624 (10th Cir. 2006), where medical evidence showed that although there was a history of DAA, the plaintiff was hospitalized during at least two periods of sobriety as a result of depression, hopelessness, and suicidal ideation). Accordingly, the ALJ's conclusion that Plaintiff's alcohol abuse was material to her claim of disability is supported by substantial evidence.

Furthermore, during the almost two-year period covered by the medical records, there appear to have been only minor adjustments[30] in Plaintiff's dosages of medication prescribed for depression and anxiety, from which it could be inferred that this treatment was effective. (*See* R. at 249, 253, 256, 259, 262, 265, 268, 269, 271, 272, 275, 278, 582, 586, 592, 598, 600, 601, 613). Indeed, the medical evidence of record indicates that when Plaintiff was compliant with her medications, her bipolar disorder – later altered to depressive disorder and generalized anxiety disorder – was controlled and improved with medication. (*See* R. at 255, 258, 268, 271, 563, 592, 596, 597, 642, 648); *see also Davis* 830 F. Supp. 2d 31 at 46. Further, Plaintiff's psychological evaluation does not indicate that she was completely disabled from working due to her bipolar condition, (R. at 287-302), and none of her medical providers indicated that her mental impairments, considered in isolation from her alcohol abuse, were sufficiently limiting as to preclude all forms of substantial gainful activity.

In sum, the evidence demonstrates that when Plaintiff was properly medicated and abstained from using alcohol, her overall condition improved. Thus, to the extent that Plaintiff claims that she continued to experience a disabling mental impairment during her periods of sobriety, the ALJ properly determined that absent Plaintiff's alcohol addiction, her residual

---

[30] The Court notes that Plaintiff's dosage for Seroquel was steadily increased between August and November, 2009, culminating in a prescription for 300 mg per day. (*See* R. at 268, 269, 271, 275). This is consistent with the traditional administration of the drug, and 300mg is within the typical dosage range. *See* Drugs.com, Seroquel Dosage, available at: http:// www.drugs.com/seroquel.html (last visited 5/17/13).

functional capacity would enable her to perform work that exists in significant numbers in the national economy. *See Robinson*, at *12-13.

In addition to her position on the DAA, Plaintiff has set forth additional arguments which the Court finds to be without merit, and as such, will only briefly address. First, Plaintiff maintains that the ALJ failed to credit the agency psychologist/consultant's opinion that she had "moderate limitation" in her ability to concentrate and persist at tasks such that she would occasionally be unable to perform even simple tasks. (Docket No. 10 at 12-13). Secondly, Plaintiff contends that the ALJ failed to adequately explain his findings at the third step of the sequential evaluation because he ignored medical opinion evidence relating to Plaintiff's GAF scores of 50 or less, which Plaintiff alleges demonstrate a continued "serious impairment" of her ability to function, even while she was sober. (*Id.* at 11).

The Court disagrees, and finds that the ALJ sufficiently provided a "discussion of the evidence" and an "explanation of reasoning" for his conclusion to deny benefits sufficient to enable meaningful judicial review. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Low GAF scores, standing alone, are never enough to satisfy the claimant's burden to show that he is disabled. *Bonani v. Astrue*, Civ. A. No. 10–0329, 2010 WL 5481551, *7, 2010 U.S. Dist. LEXIS 137871, *20 (W.D. Pa. Oct. 15, 2010) *report and recommendation adopted*, Civ. A. No. 10-329, 2011 WL 9816 (W.D. Pa. Jan. 3, 2011). Rather, they are probative evidence that must be *discussed* by the ALJ. *Id.* (internal citations omitted)(emphasis added). The claimant bears the ultimate burden of showing that his impairment meets or equals a listed impairment. *Id.* (citing 20 C.F.R. § 404.1520(a)(4)(iii), *Burnett*, 220 F.3d at 120 n. 2; *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)). And, it is the ALJ's duty to weigh the medical evidence of

record, make a credibility assessment, and resolve factual conflicts in same. *Burns*, 312 F. 3d at 118, 127, 129.

The record includes a number of GAF scores. During her diagnostic interview at Westmoreland on June 2, 2009, Plaintiff's GAF was assessed at 35. (R. at 403). At Family Services three weeks later, she was evaluated with a GAF score of 42. (R. at 541). This rating was affirmed during her initial evaluation with Dr. Kohnen in July 2009. (R. at 249). By November 2009, after four months of treatment, Plaintiff's GAF score had increased to 50. (R. at 573). On July 16, 2010, during her inpatient psychiatric evaluation precipitated by coming to therapy intoxicated and making passive death threats, Plaintiff was then assessed to have a GAF of 30 (R. at 441). Upon discharge, her GAF was ten points higher. (R. at 439). In January 2011, after a six-month lapse in treatment with Dr. Kohnen, Plaintiff's score was 45. (R. at 640).

Here, the ALJ discussed the evidence of record, including Plaintiff's GAF scores and the agency psychologist/consultant's opinion regarding Plaintiff's moderate limitation in concentration and persistence, and provided a thorough explanation of the reasoning for his conclusion that Plaintiff was not disabled, as explained above. (*See* R. at 37-42). Specifically, Plaintiff's low GAF scores correspond with the beginning of her psychological treatment (R. at 249, 403, 541), and her relapse into alcohol abuse (R. at 441, 640). Likewise, as the ALJ noted, the record does not indicate that Plaintiff's "moderate limitation" rendered her completely disabled from performing work. (R. at 43-44). Rather, as acknowledged by the ALJ, it is clear that Plaintiff's issues occurred "while [she was] was under the influence of alcohol and/or was abusing alcohol." (R. at 41).

In all, this Court is not convinced by the Plaintiff's additional arguments. It concludes that the ALJ's determination that DAA was material to Plaintiff's disability is appropriate, upon

review of the entire record. The Court also finds his ultimate conclusion that Plaintiff is not entitled to benefits to be sufficiently supported by substantial evidence. (R. at 48). Therefore, the Court will grant Defendant's Motion for Summary Judgment (Docket No. 11) and deny Plaintiff's Motion for Summary Judgment. (Docket No. 9).

## VI.    CONCLUSION

Based upon the foregoing, reversal or remand of the ALJ's decision is not warranted. Accordingly, Plaintiff's Motion for Summary Judgment is denied; Defendant's Motion for Summary Judgment is granted; and the decision of the ALJ is affirmed.   Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: May 22, 2013
cc/ecf: All counsel of record.